Matter of the Petition of the PUBLIC SERVICE COMMIS-
SION FOR THE FIRST DISTRICT, under Section 57 of
the Public Service Commissions Law, for a Writ
of Mandamus against THE BROOKLYN HEIGHTS RAIL-
ROAD COMPANY, Respondent.

Matter of the Petition of the PUBLIC SERVICE COMMIS-
SION FOR THE FIRST DISTRICT, under Section 57 of
the Public Service Commissions Law, for a Writ
of Mandamus against THE NASSAU ELECTRIC RAIL-
ROAD COMPANY, Respondent.

Matter of the Petition of the PUBLIC SERVICE COMMIS-
SION FOR THE FIRST DISTRICT, under Section 57 of
the Public Service Commissions Law, for a Writ
of Mandamus against THE CONEY ISLAND AND BROOK-
LYN RAILROAD COMPANY, Respondent.

Matter of the Petition of the PUBLIC SERVICE COMMIS-
SION FOR THE FIRST DISTRICT, under Section 57 of
the Public Service Commissions Law, for a Writ
of Mandamus against BROOKLYN, QUEENS COUNTY
AND SUBURBAN RAILROAD COMPANY, Respondent.

(Supreme Court, Kings Special Term, December, 1918)

Jurisdiction — when, cannot be limited — constitutional law — statutes.
Mandamus — when application for peremptory writ of, will be granted
— when motion by Public Service Commission for judgment on
pleadings granted — Public Service Commissions Law, § 57.

The constitutional power of the Supreme Court to exercise
general jurisdiction in law and equity cannot be limited either
by the Legislature or by any power conferred by it upon the
court itself.

Where an order of the Public Service Commission made
February 8, 1917, directing respondent to procure and operate
on surface traction lines in Brooklyn a designated number of
cars, stands unrevoked and unmodified except that the time
for compliance therewith was extended by an order made

February 20, 1918, pursuant to an agreement made between the Commission and respondent on February 15, 1918, and the Commission supposed that the things required to be done thereunder, for the most part things which its public duty would have required respondent to do anyway, could and would be done promptly despite existing war conditions, in order to afford some relief, the things required by said agreement cannot be regarded as in substitution for what was required to be done by the order of February 8, 1917, and admitting all that respondent alleges as to its understanding of the effect of said agreement it is not seriously prejudiced by what it has done in compliance therewith even if it should be required now to provide the additional surface cars, the Commission, after the rehearing provided for by said agreement had been closed, was justified in making an application under section 57 of the Public Service Commissions Law for a writ of mandamus against respondent to enforce the order of February 8, 1917, especially as before taking action the Commission waited until after the armistice, which marked the end of active warfare, had been signed and a speedy return to normal market conditions had been promised.

A motion by the Public Service Commission for judgment on the pleadings and for a peremptory writ of mandamus as prayed for, granted.

APPLICATIONS by the Public Service Commission for the first district for writs of mandamus against the several respondents.

William L. Ransom and H. M. Chamberlain, for petitioner.

Luke D. Stapleton, Charles L. Woody and D. A. Marsh, for respondents.

BENEDICT, J.  These are four practically identical applications by the public service commission for the first district, under section 57 of the Public Service Commissions Law, for writs of mandamus against the several respondents to enforce an order of the commission made February 8, 1917, requiring the

respondents collectively to procure and place in operation on surface traction lines in Brooklyn 250 cars.

At the threshold of these proceedings the respondents seek to interpose an obstacle which, if not removed, would bar the entrance upon a consideration of the merits of the controversy. They assert that this branch of the Special Term of the Supreme Court is without jurisdiction to entertain or determine this proceeding. They argue that this proceeding was improperly made returnable in Part II of the Special Term, commonly known as the Ex Parte Term; that it should have been made returnable in Special Term, Part I, where contested motions on notice are customarily made returnable. Upon this ground they asked, after filing their answers and upon the adjourned day fixed by the court at their request for the hearing upon the petitions and answers, that the orders originating these proceedings be vacated. Were it not for the high professional standing of the several counsel with the respondents, it would scarcely seem needful to say anything in reply to this objection further than to overrule it, as was done at the hearing, because there are several sufficient answers that could be made to it, if necessary. There is, however, one answer which I will make because it is conclusive. It is found in the opinion of Judge Danforth (in which all the judges of the Court of Appeals concurred) in the case entitled *People ex rel. City of New York v. Nichols,* 79 N. Y. 582. The opinion may be summed up, so far as the precise point there and here under consideration is concerned, in this extract: "It is provided by the constitution that the court itself shall have general jurisdiction in law and equity. It follows that its jurisdiction can be limited neither by the Legislature nor by any power conferred by it upon the court itself. (*Hart* v. *Hatch,* 3 Hun, 375.) Its

functions are to be exercised by its judges, sitting in General Terms, or at the Circuit, or Oyer and Terminer, or Special Terms. * * * Some of the terms thus appointed are designated by the justices as ' Special Terms for equity cases and enumerated motions,' and others as ' Special Terms for nonenumerated motions and chamber business,' and, while it cannot be doubted that for the due and orderly conduct of litigation and causes, certain steps and proceedings therein may, under the direction of the judges, be required to be taken at specified terms, yet any such regulation must be subject to the control of the justice who is assigned to hold them. If otherwise the power of the judge would be limited, public interests sometimes put in jeopardy and the rights of citizens infringed. The case before us illustrates this position.''

The authority of that opinion has never been questioned although the case has been referred to with great frequency in later cases. Among such cases was a decision of the General Term of the Supreme Court in the third department (*Mussen* v. *Ausable Granite Works,* 63 Hun, 367), wherein Judge Herrick, speaking of the jurisdiction of the Supreme Court, said: '' Its jurisdiction is as wide as the boundaries of the State, and every person, natural or artificial, within such boundaries is subject to that jurisdiction.

'' For convenience in the transaction of business the State has been divided up into districts, but the court in each district is the Supreme Court of the State, and each has the same power, no more or less than the other; it is the power and jurisdiction of the Supreme Court, not the Supreme Court of the first judicial district, or the fourth judicial district, but the Supreme Court of the State.

17

" The jurisdiction is given to each and every part of the Supreme Court, each possessing all the power granted to the court; and to confine jurisdiction in certain classes of cases to one part of the court is to deprive the rest of the court of its jurisdiction, or to limit or qualify it." See also the opinion written by Mr. Justice Jenks and concurred in by the others of the court in *People ex rel. Patrick* v. *Frost,* 133 App. Div. 179, 188.

This is a summary proceeding created and regulated by the provisions of section 57 of the Public Service Commissions Law, Laws of 1910, chap. 480, derived from Laws of 1907, chap. 429. The legislature in enacting it declared that: " In case of default in answer or after answer, the court shall immediately inquire into the facts and circumstances in such manner as the court shall direct without other or formal pleadings, and without respect to any technical requirement." The beneficial effect of this provision might easily be diminished or frustrated if rules of procedure were permitted to control the particular branch of the court wherein such applications must be heard. The Appellate Division in this department has quite rightly omitted to make any such rules for the hearing of these applications. It is, to my mind, doubtful if any power resides in any branch of the court to limit or control such hearings in another branch. I took occasion to point out in the earlier case of *Public Service Commission* v. *Brooklyn Borough Gas Co.,* 104 Misc. Rep. 315, in construing a similar statute (Pub. Serv. Com. Law, § 74), what seemed to me to be the legislative purpose in enacting that provision. It was there said: " Under the express terms of the Public Service Commissions Law, the proceeding under section 74, is intended to be

not only summary in its nature but also free from all technicalities.  In its wide-spreading scope it is of the greatest usefulness for the protection of the public in the relations sustained by public service corporations supplying gas or electricity to the public.  It is designed to afford to the Supreme Court a direct and summary visitorial power over these corporations whenever the public service commission charged with their oversight shall be of opinion that they have violated or are threatening to violate the law.  The legislature perhaps foreseeing the difficulties which have at times attended the efforts of the public service commissions to compel this class of corporations to obey the mandate of law or the orders of the commissions, wisely gave to these commissions the right of resort to this court for speedy relief, and wisely vested in this court the power to hear without delay and to determine without technicality the questions so presented to it.

" In my judgment the legislature intended, by this provision, to abolish the delays and technicalities which in the ordinary course of judicial proceedings seem inevitably associated with the practice of the law.  The court should, therefore, whenever called upon, act according to the spirit of this statute as well as to its letter; and, if it finds that sufficient reason exists for its interference in this particular class of cases, it should act promptly and efficiently to sustain the public service commissions in the just and lawful exercise of those governmental functions, powers, and duties which the legislature has vested in them and without the power of enforcement of which the usefulness of the commissions would be utterly destroyed."

The proceeding in each case was initiated by a petition, upon which the court granted an order requir-

ing the respondent to answer, and an answer in each case has been served. The several proceedings came on for hearing before the court at Special Term, Part II, on November twenty-seventh, at which time counsel for the petitioner made a motion for judgment on the pleadings, claiming that there was no issue of fact to be tried. Counsel for the respondents opposed this motion, and the court reserved decision and adjourned the hearing. The court is now to decide that motion.

The petition in each case sets forth the facts leading up to the making of the order of February 8, 1917, and certain proceedings since had, to show the violation of the order by the respondents. The facts alleged in the petition are nearly all admitted by the answer, and such attempted denials as the answer contains are ineffective to put in issue any material fact. Indeed, the respondents make no point on the denials but rest their contentions upon the defenses, of which there are four in each answer. The only ground of opposition having any semblance of merit is that it would be inequitable to enforce the order aforesaid because of existing market conditions due to the recent state of war, and because of a certain agreement between the petitioner and the respondents, which it is claimed in effect modified the order herein sought to be enforced, or at least suspended its operation. It is urged, therefore, that the rule that a writ of mandamus will be refused, in the exercise of discretion, when its operation would be inequitable should be applied.

It is necessary briefly to set forth the salient facts. The public service commission, after due notice to the respondents, given in May, 1916, and a hearing, made an order on January 10, 1917, for the furnish-

ing of these 250 cars. This order was modified in some respects by the order of February 8, 1917, the order now sought to be enforced. Shortly after the making of the latter order the companies notified the commission that they refused to accept it and could not comply with it. Thereafter the companies brought certiorari proceedings in the Supreme Court, first department, to review the order, with the result that the writ was quashed at the Special Term (*People ex rel. Brooklyn Heights R. R. Co.* v. *Public Service Commission,* 101 Misc. Rep. 10), and this action was affirmed by the Appellate Division (180 App. Div. 895). Several months were consumed in this litigation, and when it proved unsuccessful, the companies commenced an action in the Federal court to restrain the enforcement of the order. Their application for an injunction *pendente lite* was denied by the special statutory court. *Brooklyn Heights R. R. Co.* v. *Straus,* 245 Fed. Repr. 132. The companies appealed to the Supreme Court of the United States, but the action was discontinued before the appeal was heard.

In November, 1917, a rehearing before the commission was asked for by the companies, and granted, and hearings were begun on November 30, 1917, and continued from time to time until February 15, 1918. In the meantime the companies, although they had made some preparations to procure the cars required by the order of February 8, 1917, had not in fact placed orders for any cars.

On February 15, 1918, the agreement upon which the companies now rely was entered into at a meeting of the commission, and spread upon the minutes. The reason for this agreement was in the conditions due to the war, which rendered it not only difficult to get the materials needed for the cars, but unpatriotic to

attempt to enforce the order at that time. The agreement was in substance that the rehearing should be adjourned until October 14, 1918, and the time of the companies to provide for use such of the cars required by the order of February 8, 1917, as were to have been procured and put in operation by December 1, 1917, should be extended to October 14, 1918; that in the meantime the companies would proceed to purchase 100 steel rapid transit cars (or rather, I suppose, that another corporation, controlled by the same holding company which controls the respondents, should do so, for these companies, operating only surface lines, would have no use for rapid transit cars), also to make changes in 100 side entrance surface cars, so that they could be operated in two-car trains; to alter fifty other surface cars so as to adapt them to haul trailers and to purchase fifty trailers. This was the essence of the agreement, although it was clothed in verbiage which contained various statements upon which respondents base their claim that the order of February 8, 1917, ought not to be enforced against them. They claim that the things to be done under the agreement were intended to be, and understood by them to be a substitute for the things required to be done by the order, and that although they have not done any of these things (except to equip a very few cars for operation in two car trains), their failure has been due not to any fault of their own, but to conditions resulting from the state of war, which prevented the manufacturers from getting steel with which to build the cars and make the appliances necessary to comply with the agreement, and they set forth in great detail their efforts to forward the work. They further urge that the completion and operation of certain rapid transit lines, and the imminent completion and

operation of others, will release many surface cars, so as to render the 250 cars required by the order of February 8, 1917, unnecessary and useless, and they further urge that the cost of the new cars, if they be required to order them at this time, would be abnormally high, inasmuch as the steel market is in a worse condition now than it was last February. All of these facts, they urge, show that it would be grossly inequitable to enforce against them the order of February 8, 1917.

The companies' claim that the order should not be enforced can be sustained, if at all, only on equitable grounds; for the order of February 8, 1917, still stands unrevoked and unmodified, except as the time for compliance therewith has been extended by the order of February 20, 1918, made in pursuance of the agreement aforesaid. So far as the agreement of February 15, 1918, is concerned, it did not modify the order of February 8, 1917, for it was expressly stated that the adjournment should be " with the understanding * * * that neither the rights of the companies nor the rights and powers of the commission under the present order (the order of February 8, 1917) or under existing provisions of law are to be deemed in any way prejudiced by the adjournment or by the action taken by the companies," and there were other statements of a similar nature. The position of the commission is, therefore, unassailable in law, and can be attacked only on equitable grounds.

The answer to the appeals to equity by the respondent companies is that they are not in a position to urge equitable considerations in their behalf in these proceedings. They were delinquent when, nearly two years ago, the public service commission was obliged to order them to supply these 250 cars. The fact that

the commission had to make this order — which has been sustained by the courts — shows that they were not giving proper attention to the traffic needs of the community which they were supposed to serve in return for the public franchises which they enjoyed. Had they proceeded to procure these cars when the need arose, instead of waiting to be ordered by the public service commission to do so, and then seeking to avoid compliance with that lawful requirement, they could have placed orders for the cars long before the entrance of the United States into the war, when market conditions were normal, or much more nearly normal than they are to-day. If it be a hardship to them to procure these 250 cars now, it is a hardship which they have brought upon themselves by their failure to perform their duties to the public in due season.

Furthermore, in a case of this kind, the interests of the public are paramount. Traffic conditions on the respondents' lines have for a long time been unsatisfactory to the public, and recently they have become so deplorable that they cry loudly and persistently for relief. At the "evening rush hour," so called, the cars of the respondent companies on most of their lines are crowded far beyond the limits of safety and decency. Passengers ride on the roofs of the cars, on the bumpers, anywhere that they can get a foot hold and a hand hold, however precarious, in order to get to their homes without undue delay. If the companies had ordered the 250 cars when they ought to have done so, they would have had them long ago, and much of this very serious congestion could have been prevented.

In view of these just public claims, which outweigh all others, the court should give little heed to nice

considerations of equity which might be applicable were this a litigation between private parties involving only private rights and interests. "He who seeks equity must do equity" and "He who comes into equity must come with clean hands" are maxims which are clearly pertinent in these proceedings in answer to the respondents' claims to be relieved on equitable grounds from compliance with the order of the commission.

The things to be done under the agreement of February 15, 1918, by the companies cannot be regarded as in substitution for the things to be done under the order of February 8, 1917. The things to be done under the agreement were, it was apparently supposed by the commission and its counsel, things which could and would be done promptly, despite existing war conditions, in order to afford some measure of relief. When this expectation, in which the respondents must at least have concurred, was disappointed, and after the rehearing proceeding had been closed, the commission was justified in going ahead to enforce the order, especially as it waited before proceeding until after the armistice had been signed which marked the end of active warfare, and promised a speedy return to normal market conditions.

Furthermore, the things which the companies agreed to do were for the most part things which their public duty would have required them to do anyway, even if the agreement had not been made. The affiliated corporation operating rapid transit lines would have had at some time, not far distant, to buy the 100 rapid transit cars, and if the order for such cars had not been placed at about the time it was placed, the benefit of an existing option, then about

to expire, would have been lost. So far as the 50 trailer cars are concerned, the procuring of these will be accepted by the commission as a partial compliance with the order of February 8, 1917. So it appears that, admitting all that the companies allege as to their understanding of the effect of the agreement of February 15, 1918, they are not seriously prejudiced by what they have done in compliance therewith, even if they shall be required now to provide the additional 200 surface cars. If the contention that the rapid transit lines recently opened or soon to be opened will render these 200 cars unnecessary and useless were well founded, it might be ground for the refusal of the mandamus, not so much out of consideration for the companies as on general economic grounds. But I cannot agree with that contention. My opinion, in view of existing conditions already referred to, is that they will be necessary notwithstanding the use of the rapid transit lines. The court is, upon a motion of this kind, bound to accept as true the allegations of fact contained in the answers, but need not accept as true prophetic allegations.

It is further urged in support of the respondents' claim to equitable consideration that the default of the companies in the rehearing proceeding before the commission, suffered on October 14, 1918, should have been opened, and the hearing further adjourned. This contention is founded upon the statement made by counsel to the commission in the course of the discussion of the agreement of February 15, 1918, that it might be possible " at the expiration of six months or such later time as represents a restoration of conditions more nearly normal, to take up the question at the point of the present suspension of hearing and see what further facilities, if any, are requisite in the light of conditions then existing," and the further

statement of the chairman of the commission that the hearings would be adjourned to the second Monday in October " and will be further adjourned if necessary at this time." It is urged that the default was suffered inadvertently, and that normal times have not yet returned. Passing over the obvious answer that this action of the commission can be reviewed only in a proper proceeding by certiorari, an examination of the affidavits upon the motion to open the default will show that the only matters presented in support thereof were the efforts of the companies to comply with the agreement of February 15, 1918, and nothing at all to show why the order of February 8, 1917, should be modified or abrogated. Moreover, if there be any equitable ground for complaint in these proceedings by the commission, it is answered by the considerations already presented, as to the inequitable attitude of the companies toward the public.

It is urged on behalf of the commission that in a case of this kind under the statute the discretion to refuse a writ of mandamus on equitable grounds does not reside in the court, which must enforce the order if it be a lawful and existing order. In view of what I have said, I deem it unnecessary to decide this question.

The war having ceased, it cannot be claimed that it is impossible for the respondents to comply with the order of February 8, 1917. With respect, however, to the question of time within which they must comply with the writ to be issued, I will hear counsel now.

The motion for judgment on the pleadings in each case is granted, and a peremptory writ of mandamus will issue in accordance with the prayer of the petition.

Ordered accordingly.